**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


**COURTNEY PAYTON, ET AL**                                    **CIVIL ACTION**


**VERSUS**                                                    **NO: 12-2452**


**ENTERGY CORPORATION, ET AL**                               **SECTION: "H"(5)**


<u>**ORDER AND REASONS**</u>

Before the Court are Plaintiffs' Motion to Remand (Doc. 36), and Defendants' Motion *in limine* to exclude the testimony and opinions of Dr. Schneider (Doc. 50).  For the following reasons, the Motion *in limine* is GRANTED IN PART and DENIED IN PART and the Motion to Remand is GRANTED.


**BACKGROUND**

On August 28, 2012, Hurricane Isaac made landfall in southeastern Louisiana.  As a result

1

of the storm, many residents of southeastern Louisiana lost power for several days.  On September 3, 2012, Plaintiffs filed the instant class action lawsuit in the Orleans Parish Civil District Court against Entergy Corporation, Entergy New Orleans, Inc. ("ENO") and Entergy Louisiana, LLC ("ELL").  ENO provides utility services to the east bank of Orleans parish, while ELL provides utility services to most of southern Louisiana outside of New Orleans.   Plaintiffs essentially alleged that Defendants breached their respective duties to ensure a timely restoration of power to their customers.

The state court petition identifies two distinct classes of plaintiffs.  The first is defined as:

> All ENO electricity customers or those individuals who are dependent on the customer's receipt of electricity (other occupants of residential customers' property and employees of commercial customers) who lost electricity on or after August 28, 2012 as a result or associated with Tropical Storm or Hurricane Isaac.

The second class is defined identically with the exception that it includes customers of ELL.

On October 5, 2012, Defendants removed the case pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  On October 22, 2012, Plaintiffs filed a motion to remand.  The Court denied the motion without prejudice and ordered the parties to conduct limited jurisdictional discovery.  Following the completion of discovery, Plaintiffs re-urged their motion to remand.  In support of their motion, Plaintiffs retained the services of Dr. Helmut Schneider, an expert in statistics.  Plaintiffs requested that Dr. Schneider design a survey which could be used to determine the citizenship of a representative portion of the Plaintiff class.  The purpose of this survey was to

allow Dr. Schneider to offer an opinion regarding the percentage of the class members who are

Louisiana citizens.  Following completion of the survey, Defendants filed a motion *in limine* to

exclude the testimony of Dr. Schneider and all evidence of the survey.

**LEGAL STANDARD**

**I. Admissibility of Expert Testimony under Daubert**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which

provides as follows:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and
> methods; and
>
> (d) the expert has reliably applied the principles and
> methods to the facts of the case.

Fed. R. Evid. 702.  The current version of Rule 702 reflects the United Supreme Court's decisions

in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526

U.S. 137 (1999).

The threshold inquiry is whether the expert possesses the requisite qualifications to render opinion on a particular subject matter. *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 799 (E.D. La. 2011); *see also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."). Having defined the permissible scope of the expert's testimony, a court next inquires whether the opinions are reliable and relevant. *See United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted).

In performing this tripartite analysis, courts must give proper deference to the traditional adversary system and the role of the jury within that system. *See Daubert*, 609 U.S. at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citation omitted). As the "gatekeeper" of expert testimony, *Daubert*, 509 U.S. at 597, this Court enjoys broad discretion in determining admissibility. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013).

The Fifth Circuit has stated on multiple occasions that "most of the safeguards provided for in *Daubert* are not as essential . . . where a district judge sits as the trier of fact in place of a jury." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). *See also In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 329 (5th Cir. 2013); *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 358 (5th Cir. 2012); *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 332 (5th Cir. 2010). Indeed, at least five

other circuits have held that the *Daubert* gatekeeping role is substantially less important where the judge sits as the finder of fact.[1]  Perhaps the best statement of this principle comes from the Eleventh Circuit: "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."  *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir.2005).

## II. Subject Matter Jurisdiction under CAFA

28 U.S.C. § 1332(d) provides that federal courts have original jurisdiction over certain class action suits.  Generally, federal courts may assert jurisdiction over a case in which the members of the plaintiff class are minimally diverse from the named defendants and the aggregate amount in controversy exceeds five million dollars.  28 U.S.C. § 1332(d).  There are three exceptions to this rule: the "local controversy" exception; the "home state" exception; and the "discretionary" exception.  *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 804, 810–11 (5th Cir. 2007) (*"Preston I"*).  The first two exceptions are mandatory.

Under the local controversy exception, the district court shall decline to exercise jurisdiction:

> (I) over a class action in which--
> (I) greater than two-thirds of the members of all proposed
> plaintiff classes in the aggregate are citizens of the State in which
> the action was originally filed;

---

[1] *See, e.g., In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ; *Attorney Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009); *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir.2005); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002).

(II) at least 1 defendant is a defendant-
    (aa) from whom significant relief is sought by members of
    the plaintiff class;
    (bb) whose alleged conduct forms a significant basis for
    the claims asserted by the proposed plaintiff class; and
    (cc) who is a citizen of the State in which the action was
    originally filed; and
(III) principal injuries resulting from the alleged conduct or any
related conduct of each defendant were incurred in the State in
which the action was originally filed; and
(ii) during the 3-year period preceding the filing of that class action,
no other class action has been filed asserting the same or similar
factual allegations against any of the defendants on behalf of the
same or other persons.

28 U.S.C. § 1332(d)(4)(A).

The home state exception requires the district court to decline jurisdiction when "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B).

In addition to the mandatory exceptions to jurisdiction, a court may choose to decline jurisdiction "in the interests of justice" when primary defendants and more than one-third of the plaintiff class are citizens of the state in which the action was initially filed. 28 U.S.C. § 1332(d)(3). A court must examine six factors under the discretionary exception:

(A) whether the claims asserted involve matters of national or
interstate interest;
(B) whether the claims asserted will be governed by laws of the
State in which the action was originally filed or by the laws of

6

other States;

(C) whether the class action has been pleaded in a manner that
seeks to avoid Federal jurisdiction;

(D) whether the action was brought in a forum with a distinct nexus
with the class members, the alleged harm, or the defendants;

(E) whether the number of citizens of the State in which the action
was originally filed in all proposed plaintiff classes in the
aggregate is substantially larger than the number of citizens
from any other State, and the citizenship of the other members
of the proposed class is dispersed among a substantial number
of States; and

(F) whether, during the 3-year period preceding the filing of that
class action, 1 or more other class actions asserting the same or
similar claims on behalf of the same or other persons have been
filed.

*Id.* Under CAFA, the moving party on the remand motion bears the burden of proving the existence

of an exception by a preponderance of the evidence.  *Preston*, 485 F.3d at 812; 814.


**LAW AND ANALYSIS**

There are two motions before the Court.  In the Motion to Remand, Plaintiffs argue that the

facts of this case satisfy all three of CAFA's jurisdictional exceptions.  In response to the Motion to

Remand, Defendants filed the Motion *in limine* in which they argue that the survey and Dr.

Schneider's opinions are inadmissible under Daubert.  Defendants argue that, in the absence of the

survey evidence, Plaintiffs cannot meet their burden on the Motion to Remand.  The Court

concludes that the sample constructed by Dr. Schneider, the residential survey, and Dr. Schneider's

opinions regarding the residential survey are reliable and that Plaintiffs' have met their burden on

7

the Motion to Remand.

**I.  Admissibility of Dr. Schneider's Testimony and the Survey**

Defendants have filed a Motion *in limine* to exclude the testimony of Dr. Schneider and evidence of the survey.  Defendants contend that Dr. Schneider is not qualified as an expert in survey design and that the survey was not administered in a reliable manner.

A.  Qualifications

The Fifth Circuit has held that "[t]o qualify as an expert, the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth."  *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004)  (alterations in original) (internal quotation marks and citations omitted).  Additionally, Rule 702 provides that an expert must be qualified by "knowledge, skill, experience, training or education."  Fed. R. Evid. 702.  "[A]n expert witness is not strictly confined to his area of practice, but may testify concerning related applications."  *United States v. Wen Chyu Liu*, 716 F.3d 159, 168–69 (5th Cir. 2013) (quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)). In other words, an expert need not be "highly qualified" in order to offer testimony on a particular issue.  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).  "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."  *Id.* (citations omitted);  *see also Wen Chyu Liu*, 716 F.3d at 168 ("A lack of specialization should generally go to the weight of the evidence rather than its admissibility.").

8

Dr. Schneider obtained a masters in mathematics in 1974 and a Ph.D. in operations management and statistics in 1978.  Dr. Schneider currently serves as the Associate Dean for Research and Economic Development at Louisiana State University, where he has also served as chairman of the Information Systems and Decision Sciences Department since 1994. Dr. Schneider is also a professor of business and teaches courses in the areas of statistics, information systems, and operations management.  Most importantly, he teaches both graduate and undergraduate classes in survey design.  He testified that he is a member of several professional organizations such as the American Statistical Association, and the Institute of Decision Sciences and Transportation Research Association.  His curriculum vitae states that he has written two books and published over 50 journal articles in the field of statistics.  Dr. Schneider also testified that he has a substantial consulting practice.  Most notably, he has served as a consultant for the State of Louisiana and the Louisiana Highway Safety Commission regarding the statistical analysis of automobile crashes in Louisiana.

Defendants stipulated that Dr. Schneider was qualified as an expert in statistics, but disputed his qualifications as an expert in survey design.  The Court finds that Dr. Schneider is an accomplished statistician with impressive qualifications.  Dr. Schneider has taught both graduate and undergraduate courses in survey design and he testified that survey design is part of his expertise as a statistician.  This Court finds Dr. Schneider eminently qualified as an expert in both statistics and survey design.

9

B. <u>Reliability</u>

"Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012) (citation omitted).  In *Daubert*, the Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony.  *See Daubert*, 509 U.S. at 592–96.  "These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citation omitted).  The Supreme Court has cautioned that the reliability analysis must remain flexible: the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kuhmo Tire*, 526 U.S. at 150 (internal quotation marks and citation omitted).  Thus, "not every *Daubert* factor will be applicable in every situation . . . and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004) (citation omitted).  The proponent of the expert's testimony bears the burden of proving reliability by a preponderance of the evidence. *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 387–88 (5th Cir. 2010) (citation omitted).

At the outset, the Court notes that Defendants do not question the validity of the science underlying Dr. Schneider's analysis, nor do they argue that he conducted his analysis in a manner

10

inconsistent with the science of statistics.  Instead, Defendants' object to the reliability of the evidence analyzed by Dr. Schneider.  Defendants contend that the survey was poorly designed and improperly administered.  The Court addresses each argument separately.

*I. Survey Design*

The purpose of the survey in this case is to determine the percentage of the proposed class members who are Louisiana citizens.  Thus, in order for the results of the survey to be reliable, the survey has to elicit information from which this Court can reasonably ascertain the citizenship of the survey respondents.  In this case, Dr. Schneider designed two similar surveys.  One was administered to residential customers, and the other to commercial customers.  The Court will address each survey in turn.

a. Residential Survey

Defendants argue that the residential survey was not appropriately designed in that the questions do not enable this Court to accurately ascertain the citizenship of the respondents.  The Court disagrees.

The basic principles of domicile are well-settled.  An individual is domiciled in a place where he is physically present and intends to remain for the foreseeable future.  *Coury v. Prot*, 85 F.3d 244, 250 (5th Cir. 1996).  While the question of physical presence is usually an easy one, the question of intent may be more difficult.  The Fifth Circuit has developed a list of factors which a court may consider in determining whether an individual has the requisite intent to remain.  "The

11

factors may include the places where the litigant exercises civil and political rights, pays taxes, owns real and personal property, has driver's and other licenses, maintains bank accounts, belongs to clubs and churches, has places of business or employment, and maintains a home for his family." *Id*.

The residential survey clearly focuses on the factors enunciated in *Coury*. The survey first asks where the respondent resides, and whether he or she "intend[s] to continue living in Louisiana." This initial inquiry is followed by questions obviously based on the *Coury* factors: whether the respondent owns property, has drivers or other licenses, votes, maintains bank accounts, or belongs to clubs or churches in Louisiana. Thus, the Court finds the questions sufficient to determine the domicile of the respondents.

      b. Commercial Survey

Defendants have also objected to the design of the commercial survey. They correctly note that corporations and unincorporated associations are (under CAFA) citizens of the state under whose laws they are organized and the state in which their principal place of business is located. 28 U.S.C. § 1332(c), (d)(10). Defendants argue that the commercial survey does not ask questions which enable this Court to determine the citizenship of the respondents. Defendants are correct. The commercial survey questions are virtually identical to the residential survey questions. Because the commercial survey questions are based on the *Coury* factors instead of the CAFA citizenship standard for corporations and unincorporated associations, the Court must reject the

commercial survey under *Daubert*.  However, this error does not completely invalidate the commercial results.

Dr. Schneider's work in this case can be separated into two parts.  First, he constructed the sample.  This is the smaller, representative group of potential class members who were selected to be surveyed.  As discussed above, Defendants do not contest the reliability of the sample constructed by Dr. Schneider.  Thus, Defendants have effectively conceded that the sample is representative of the entire Plaintiff class.  Additionally, based on its own review of the evidence, the Court concludes that Dr. Schneider's sampling technique meets the *Daubert* reliability standard and accepts the sample.  Accordingly, if the Court is able to ascertain the citizenship of the sampled commercial customers based on competent evidence, then the results of that analysis may be reliably extrapolated to the entire Plaintiff class.  In this case, Plaintiffs have provided such evidence.[2]

### ii. Survey Administration

Defendants also argue that the surveys are unreliable because they were improperly administered by the survey administrator, Lisa Rodriguez.  Defendants additionally contend the survey is unreliable because it was not double-blind and the results were not independently validated.

---

[2]Plaintiffs evidence in this regard is discussed fully in the section of this Order addressing the merits of the Motion to Remand.

Defendants' arguments are unpersuasive.  Defendants' arguments are part of their larger contention that Plaintiffs failed to scrupulously comply with the recommendations of the Federal Judicial Center's Reference Guide on Survey Research.  Federal Judicial Center, *Reference Manual on Scientific Evidence* 359 (3rd ed. 2011).  This argument is misplaced for several reasons.  First, the Manual itself cautions that it is "not intended to instruct judges concerning what evidence should be admissible or *to establish minimum standards for acceptable scientific testimony*." *Id*. at xv.  Yet, Defendants insist that this Court do precisely what the Manual itself proscribes.  The Court declines Defendants invitation to misuse the Manual, and further notes that the arguments derived from it are erroneous.

The Manual recommends that surveys designed for introduction in court be administered in a double-blind manner.  *Id*. at 410–11.  A survey is double-blind when neither the surveyor nor the respondent knows the purpose or sponsor of the survey.  *Id*. at 411.  The function of such a procedure is to prevent bias from impacting the survey.  In other words, it is to prevent respondents from giving the answer that they think the interviewer wants to hear.  This is a significant concern in opinion-based surveys.  The Court finds, however, that double-blind administration would have been an unnecessary precaution to take in this circumstance.

Dr. Schneider's survey was not an opinion survey.  Respondents were asked objective questions about such facts as where they live, whether they own property, where they vote, etc.  While the Court understands the risk of bias that exists in opinion surveys, to believe that a

14

respondent would lie when faced with an objective question in order to influence the outcome of this survey strains credulity.  Furthermore, the Court seriously doubts that knowing the purpose and/or sponsor of the survey would enable a lay person to ascertain the "preferred answer" to the questions.  Moreover, Dr. Schneider testified that while a double-blind study was not feasible in this case due to time concerns, the objective nature of the questions reduced the need for such a precaution.  Thus, the Court finds that a double-blind survey was unnecessary.

Therefore, the Court finds that Dr. Schneider's opinions are sufficiently reliable to warrant admission into evidence.  The remainder of Defendants' arguments more properly go to the weight of Dr. Schneider's opinions, as opposed to their admissibility, and are fully addressed later in this Order.

C.  Relevance

Expert testimony is relevant if it "will help the trier of fact to understand the evidence or determine a fact at issue." Fed. R. Evid. 702(a).  "Put differently, Rule 702 'requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (quoting *Daubert*, 509 U.S. at 592).  The testimony must also satisfy the requirements of Federal Rule of Evidence 401.  *Bocanegra*, 320 F.3d at 584 (citation omitted).

The relevance of Dr. Schneider's opinion is relatively uncontested.  While Defendants vigorously object to both his methods and his conclusions, all parties, and the Court, agree that Dr.

15

Schneider's opinions go directly to the heart of the dispute on this motion: the percentage of class members who are Louisiana citizens.  Thus, Dr. Schneider's testimony is relevant and will be admitted for the purposes of this motion.

    D. <u>Conclusion</u>

For the foregoing reasons, Defendants' Motion *in limine* is GRANTED IN PART and DENIED IN PART.  Dr. Schneider is accepted as an expert in the fields of statistics and survey design. Additionally, the sample he created from Defendants' customer lists meets the *Daubert* reliability standard, as do the results of the residential survey.  However, the commercial survey and results do not meet the *Daubert* reliability standard and are excluded.

**II. Remand under CAFA**

Plaintiffs argue that all three exceptions to jurisdiction under CAFA are applicable.  For the reasons that follow, the Court concludes that remand is justified under all three of the asserted grounds.

    A. <u>Local Controversy Exception</u>

The local controversy exception requires that a case be remanded if Plaintiffs demonstrate that: (1) at least two-thirds of the class members are Louisiana citizens; (2) at least one defendant from whom significant relief is sought and whose alleged conduct forms a significant basis for the claims is a citizen of Louisiana; (3) the principal injuries complained of occurred in Louisiana; and (4) during the 3-year period preceding the filing of the class action, no other class action has been

16

filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons.  28 U.S.C. § 1332(d)(4)(A).

It is undisputed that all of the named defendants are Louisiana citizens.  Thus, it follows that at least one defendant from whom significant relief is sought and whose alleged conduct forms a significant basis for the claims is a citizen of Louisiana.  There is also no dispute that the principal injuries at issue occurred in Louisiana.  Finally, the Court is not aware of any other class action asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons, nor have the parties brought such a case to the Court's attention. Therefore, the only disputed factor is the citizenship of the Plaintiff class.

B. Home State Exception

The home state exception requires the district court to decline jurisdiction when "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed."  28 U.S.C. § 1332(d)(4)(B).  Again, there is no dispute that all of the Defendants in this matter are Louisiana Citizens.  Thus, the Court finds that remand is required if Plaintiffs establish that more than two-thirds of the proposed class members are Louisiana citizens.

C. Citizenship of the Plaintiff Class

I. Background and Legal Standard

Plaintiffs have defined two distinct classes: (1) "all ENO electricity customers or those

17

individuals who are dependent on the customer's receipt of electricity (other occupants of residential customers' property and employees of commercial customers) who lost electricity on or after August 28, 2012 as a result or associated with Tropical Storm or Hurricane Isaac," and (2) "all ELL electricity customers or those individuals who are dependent on the customer's receipt of electricity (other occupants of residential customers' property and employees of commercial customers) who lost electricity on or after August 28, 2012 as a result or associated with Tropical Storm or Hurricane Isaac." As part of the jurisdictional discovery ordered by the Court, Defendants produced a list of all ENO and ELL customers who lost power as a result of Isaac. This list reflects that 177,037 ENO customers and 466,011 ELL customers are potential class members.[3]

Given that the proposed class exceeds 500,000 customers, it is impractical for Plaintiffs to prove the citizenship of at least 330,000 individuals and corporations. Indeed, other courts confronted with large class sizes have not imposed such an onerous requirement. Instead, under CAFA, Plaintiffs must prove that it is more likely than not that two-thirds of the proposed class are Louisiana Citizens.

The Fifth Circuit addressed the evidentiary standard for proving class citizenship in *Preston I*. In that case, the proposed class was composed of patients and relatives of deceased patients

---

[3]Defendants have noted that there may be some minor errors in these lists due to incorrect reporting and/or system errors. However, Defendants have not attempted to argue that these errors, to the extent they exist, have any effect on the Court's analysis of the motion. Since these lists appear to be the most accurate estimation of the proposed classes available, and there do not appear to be any significant errors, the Court finds that the lists are sufficiently reliable for the purposes of this motion.

who were hospitalized at a Louisiana hospital during Hurricane Katrina.  *Preston I*, 485 F.3d at 808.

The district court granted a motion to remand under the local controversy, home state and

discretionary exceptions to CAFA.  *Id*. at 808–09.  Much of the dispute in *Preston I* surrounded the

burden of proof regarding the citizenship of the plaintiff class.  On appeal, the Fifth Circuit

addressed whether the movant had established that one-third of the plaintiff class members were

Louisiana citizens.[4]  *Id*. at 813–18.  In support of the motion, the movant produced a list of the 256

patients who were at the hospital at the time of the storm, the patients' billing addresses, the

emergency contact information the patients had provided on admission, and affidavits from eight

potential class members (six of which were from the named plaintiffs) attesting to their Louisiana

domicile.  *Id*. at 814–16.

The defendant opposing remand in *Preston I* argued that the movant was obligated to

produce evidence conclusively demonstrating that at least one-third of the class members were

domiciled in Louisiana.  *Id*. at 816.  In rejecting this argument, the Fifth Circuit noted that such a

requirement would make the jurisdictional analysis nearly unworkable for district courts.  Instead,

the court held that "the evidentiary standard for establishing the domicile of more than one

hundred plaintiffs must be based on practicality and reasonableness."  *Id*.  The court found that the

evidence presented "permitted the district court to make a *reasonable assumption* that at least

---

[4]In *Preston I*, the movant on the motion to remand was a defendant who had not consented in the removal.  *Preston I*, 485 F.3d at 808.  Thus, as the movant, it was a defendant who bore the burden on the motion to remand.  *Id*.  This distinction is of no consequence to the case before this Court.

one-third of the class members were citizens of Louisiana." *Id*. at 817 (emphasis added).  The Fifth

Circuit held that "the district court, based on a preponderance of the evidence, made a *credible*

*estimate* that at least one-third of the class were citizens of Louisiana," and affirmed.  *Id*. at 822

(emphasis added).[5]

      *Preston II*, (the companion case to *Preston I*) is particularly illustrative because there the

Fifth Circuit rejected remand, despite its similarities to *Preston I*.  *Preston v. Tenet Healthsystem*

*Mem'l Med. Ctr., Inc.*, 485 F.3d 793 (5th Cir. 2007) ("*Preston II*").  *Preston II* involved a class action

with similar facts to *Preston I,* but against a different hospital.  However, in *Preston II*, the only

evidence with which the court was presented regarding the citizenship of the class members were

addresses culled from the medical billing records of the defendant.  *Id*. at 798–99.  Plaintiffs in

*Preston II* did not submit any evidence indicating that the class members with Louisiana residences

intended to remain in Louisiana.  *Id*. at 800–01.  Additionally, because *Preston II* was filed one year

after Katrina (as opposed to two months in *Preston I*) the court was unable to apply a presumption

that the class members, who may have been domiciled in Louisiana at the time of Katrina, had

maintained their Louisiana domicile after the storm.  *Id*. at 801–02.  Thus, it appears that the major

distinguishing factors between *Preston I* and *Preston II* are the evidence of intent to remain in

---

[5] Other sections of this Court, as well as the Fifth Circuit, have embraced this common sense approach.  *See, e.g., Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 567 (5th Cir. 2011);  *Caruso v. Allstate Ins. Co.*, 469 F. Supp. 2d 364 (E.D. La. 2007); *Bennett v. Bd. of Comm'rs for E. Jefferson Levee Dist.*, No. 07-3130, 2007 WL 2571942, at *4 (E.D. La. Aug. 31, 2007).

Louisiana presented in *Preston I* and the massive relocation that took place post-Katrina which deprived the *Preston II* court of the ability to presume that the class members had maintained their Louisiana domicile.

### ii. Plaintiffs' Evidence

Plaintiffs in this case have marshaled substantially more evidence than movants in either *Preston I* or *Preston II*. Dr. Schneider was provided with a list of Entergy customers. Dr. Schneider's expert report was received into evidence, as were the customer lists. Dr. Schneider preliminarily notes that, based on a review of the customer lists, 96.4% of the listed customers have a Louisiana billing address, a number that the Court was able to verify based on its own review of the customer lists.

Next, Dr. Schneider created a representative sample of 500 customers from each of the ENO and ELL lists. At the evidentiary hearing, Dr. Schneider explained that the 500-person sample size was significantly larger than would be required for him to form a reliable opinion, but that he selected such a large sample out of an abundance of caution. Dr. Schneider then worked with the attorneys for the Plaintiffs to create survey questions designed to elicit information regarding the citizenship of the respondents. Dr. Schneider designed two surveys, one for residential customers and the other for commercial customers. The survey questions were:

**Residential Survey**[6]
1. Did you live at the following address in 2012?
2. Are your current plans to continue to live in Louisiana?
3. Do you own property in Louisiana, like a car, truck, boat or home?
4. Do you have a Louisiana driver's license or other licenses (e.g. hunting, fishing, occupational) or identification card issued by the State of Louisiana?
5. Do you attend church or belong to any clubs or organizations (Knights of Columbus, Masonic Lodge, etc.)?
6. Do you vote in Louisiana?
7. Do you maintain any bank accounts in Louisiana?
8. Do you consider yourself a citizen of Louisiana?
9. Did you experience a power outage on or between August 29, 2012 and September 2, 2012 due to Hurricane Isaac?
10. Do you have anyone else living with you at this address?
11. What is your relationship to the other occupants living at this address?
12. To the best of your knowledge are these other occupants citizens of Louisiana?

Plaintiffs retained a paralegal, Lisa Rodriguez, to administer the survey by telephone. Dr. Schneider testified that he instructed the attorneys for the Plaintiffs to report back to him periodically on the results because, depending on the response rate and the percentage of customers who initially appeared to be Louisiana citizens, it might become unnecessary to contact the full sample. Ultimately, Dr. Schneider stopped the surveys after Ms. Rodriguez had called 257 ENO customers and 202 ELL customers. Of those customers called, 112 ENO customers and 80 ELL customers completed the survey. At the hearing, Dr. Schneider explained that he chose to stop the

---

[6]The questions asked in the commercial survey were substantially similar to those asked in the residential survey.

survey when he did because it appeared that a very high percentage (over 90%) of respondents were domiciled in Louisiana.  Dr. Schneider testified that he was 95% confident that the results of this survey were representative of the general population of class members.

Once the survey was completed, Ms. Rodriguez forwarded her results to Dr. Schneider.  He concluded that 98% (110/112) of ENO customers surveyed, and 99% (79/80) of ELL customers surveyed were Louisiana citizens.  He further noted that, even assuming that all non-responding customers were non-citizens, 46.3% (110/257) of ENO customers, and 39.6% (79/202) of ELL customers were Louisiana citizens.

This Court has significantly more evidence before it than did the court in *Preston I*.  In *Preston I*, the court was presented with a list of the potential class members, their billing addresses, their emergency contact information, and affidavits from eight potential class members attesting to citizenship.  *Preston I*, 485 F.3d at 808–09.  Here, the Court has a list of the potential class members, their billing addresses, and, instead of eight affidavits, 189 responses to a survey asking questions about the respondents' domicile.  Accordingly, given the fact that the evidence strongly suggests that more than 90% of class members are Louisiana citizens, this Court has no difficulty finding that Plaintiffs have proven, by a preponderance of the evidence, that more than two-thirds of the proposed Plaintiff class are Louisiana citizens.

### iii. Defendants' Objections

Defendants have lodged numerous objections to the survey.  Generally, the objections fall

into four categories: the design of the residential survey; the design of the commercial survey; the administration of the surveys; and, the interpretation of the results.  It is important to first note the elements of the survey to which Defendants do not object.  As previously noted, Defendants have not objected to the manner in which Dr. Schneider selected the sample of proposed class members or to the size of the sample selected.  Thus, it is clear that all parties agree the sample as selected by Dr. Schneider is appropriately representative of the Plaintiff class.  Accordingly, to the extent the Court is able to determine the citizenship of the sample customers, that result can be reliably extrapolated to the class as a whole.

### a. Design of the Residential Survey

In order for the results of the survey to be reliable, the survey has to elicit information from which this Court can reasonably ascertain the citizenship of the survey respondents.  Defendants argue that the residential survey was not appropriately designed to accomplish this purpose.  The Court disagrees for the reasons discussed previously.

### b. Design of the Commercial Survey

Defendants have also objected to the design of the commercial survey.  They correctly note that corporations and unincorporated associations are (under CAFA) citizens of the state under whose laws they are organized and the state in which their principal place of business is located. Defendants argue that the commercial surveys do not ask questions from which the Court can determine citizenship.  Defendants are correct, for the reason previously discussed.  This would be

24

a serious flaw in the survey, but-for the additional evidence offered by Plaintiffs at the hearing.

In response to Defendants' arguments, Plaintiffs investigated the domicile of all the commercial customers included in the survey. At the hearing, Plaintiffs introduced certified copies of the Louisiana Secretary of State filings for the businesses which responded to the survey. Based on this evidence, the Court is able to conclude that all five of the ELL businesses surveyed are citizens of Louisiana, and that at least eight of the thirteen ENO businesses surveyed are Louisiana citizens because they are organized under the laws of Louisiana.[7]  Therefore, because the Court is able to independently determine the citizenship of the sampled commercial customers, the flaws in the commercial survey questions have no impact on the final analysis.

c. Administration of the Surveys

Defendants argue that the surveys are unreliable because they were improperly administered. Most of these arguments pertain to the manner in which the survey administrator, Lisa Rodriguez, allegedly framed the questions when speaking to the respondents. Defendants claim that she lacked sufficient training to administer the survey, that she asked questions out of order, that she deviated from the prepared script, that she failed to record off-script exchanges with respondents, and that she recorded responses incorrectly. The Court rejects these arguments.

Most of Defendants' arguments in this regard are supported by the testimony of two

---

[7]The Court attaches specific findings regarding the citizenship of the commercial respondents as an addendum to this Opinion. The addendum is filed under seal in accord with the protective order entered in this matter (Doc. 21).

witnesses.[8]  Both witnesses are Entergy employees who testified regarding the behavior of Ms. Rodriguez during the telephone survey.  The Court makes no finding regarding the credibility of these witnesses; but does note that, even accepting their testimony as true, both surveys correctly identified these two Entergy employees as Louisiana citizens.  Furthermore, despite the plethora of objections made by Defendants, they are unable to identify a single residential survey which produced an incorrect result.

Finally, the Court notes that Ms. Rodriguez's testimony reveals that there were no fatal flaws in the administration of the survey.  The Court found Ms. Rodriguez's testimony to be very credible.  She candidly admitted some mistakes in the administration of the survey, specifically when it came to deviating from the prepared script.  For example, she explained that, early in the survey process, some customers hung up on her when she asked them whether they maintained bank accounts in Louisiana.  Thus, in an effort to keep the respondents on the phone, she would tell them just before asking the question that it was a yes or no question and that she would not ask any follow-up questions.  The Court finds that, as a whole, any deviations Ms. Rodriguez may have made from the survey script were in good faith and had no material effect on the outcome of the objective survey responses.  Again, the Court stresses that Defendants have not identified a single residential survey which incorrectly identified the domicile of the survey respondent.

---

[8]The witnesses are not named individually here in accordance with this Court's protective order (Doc. 21).

d. Tabulation of the Surveys

Defendants have raised several objections to the manner in which the survey results were tabulated and interpreted by Dr. Schneider.  Regardless of how Defendants frame the objections, they assert two basic arguments: (1) that Dr. Schneider's method for determining the citizenship of the respondents was improper, and (2) that Dr. Schneider's estimation of the citizenship of the respondents dependents is incorrect.  Neither argument has merit.

With regard to the first argument, Defendants argue that Dr. Schneider's method for determining the citizenship of the respondents was inconsistent with the law governing domicile. Defendants are partially correct.  Dr. Schneider did not employ the correct method for determining the domicile of the commercial respondents.  However, that error has been rendered harmless by Plaintiffs' subsequent investigation into the domicile of the commercial customers.  Since the Court is able to independently determine the number of commercial customers from the sample who are Louisiana citizens, any errors Dr. Schneider may have made in this regard are harmless.

As to the residential customers, the Court has already explained that the surveys were appropriately designed to illicit the information necessary to determine the domicile of the respondents.  However, Defendants argue that Dr. Schneider ignored all of the questions in the survey except question eight.  Question eight asked whether the respondent considered themself a citizen of Louisiana.  Defendants argue that Dr. Schneider simply counted every respondent who answered question eight in the affirmative as a Louisiana citizen while ignoring answers to the

27

remaining questions.  Defendants are incorrect.

In response to questioning from the Court at the hearing, Dr. Schneider explained that, no single question was dispositive in his analysis.  Instead, he looked first to whether a respondent indicated they resided in Louisiana and whether they indicated that they intended to remain in Louisiana.  Next, Dr. Schneider examined the respondents answers to the remaining survey questions.  He testified that, in analyzing the answers to the remaining questions, he was looking for answers which tended to corroborate the respondents initial representation that they intended to remain in Louisiana.  Furthermore, he specifically testified that an affirmative answer to question eight was not enough for him to count a respondent as a citizen of Louisiana.  This testimony alone is sufficient to reject Defendants' objections.  However, the Court took the additional step of verifying Dr. Schneider's results.

The parties submitted into evidence all of the survey responses.  Based upon its own review of the responses, the Court finds that at least 70 of the 75 ELL residential customers and 91 of the 95 ENO residential customers surveyed are Louisiana citizens.  When combined with the Court's review of the commercial customers, the Court finds that 75 out of 80 ELL customers and 99 out of 108 ENO customers surveyed are Louisiana citizens.  Therefore, the Court finds that Plaintiffs have proven that at least 92.55% of the customers surveyed are Louisiana citizens.  Given that Dr. Schneider testified that he is 95% confident that the results of the survey accurately reflect the total population (*i.e.,* all customers affected by Isaac), this Court easily concludes that Plaintiffs

28

have met their burden of proof by a preponderance of the evidence.[9]

Finally, Defendants argue that the survey has not conclusively established that the customers' dependents, and thus the remainder of the class, are Louisiana citizens.  In making this argument, Defendants ask this Court to disregard the common sense approach advocated by the Fifth Circuit in *Preston I* and *Hollinger*.  It follows that, if an Entergy customer is a Louisiana citizen, the vast majority of his or her dependents or employees are also Louisiana citizens.  This is especially true of residential customers, who make up more than 80% of the proposed class.  The Court simply refuses to abandon logic and common sense by finding, as the Defendants invite, that any uncertainty regarding the citizenship of the customers' dependants is sufficient to disregard the clear fact that far more than two-thirds of the proposed Plaintiff class members are Louisiana citizens.

Plaintiffs have the burden to prove that two-thirds of the proposed class are Louisiana citizens.  Plaintiffs have met this burden by presenting this Court with significantly more evidence of the class members' citizenship than the Fifth Circuit had before it in *Preston I*.  In the face of reliable evidence indicating that over 90% of the proposed class are Louisiana citizens, Defendants ask the Court to abandon logic and common sense and find that minor deficiencies in the survey

---

[9]*See, e.g., In re Sprint Nextel Corp.*, 593 F.3d 669, 676 (7th Cir. 2010) ("Statisticians and scientists usually want at least 95 percent certainty, but any number greater than 50 percent would have allowed the district court to conclude that the plaintiffs had established the citizenship requirement by a preponderance of the evidence.") (internal citations omitted).

are fatal flaws.  The Court simply refuses to believe that the minor deficiencies identified by

Defendants are so severe as to render the results of the survey unreliable.  Accordingly, this Court

finds that both the home state and local controversy exceptions to CAFA require this matter to be

remanded.

      D.  <u>Discretionary Remand</u>

      The Court has already found that remand is required by both the home state and local

controversy exceptions to CAFA.  Nonetheless, out of an abundance of caution, the Court will also

consider the discretionary remand provision of CAFA.  This provision of CAFA provides that  "[a]

district court may, in the interests of justice and looking at the totality of the circumstances, decline

to exercise jurisdiction [] over a class action in which greater than one-third but less than two-thirds

of the members of all proposed plaintiff classes in the aggregate and the primary defendants are

citizens of the State in which the action was originally filed based on consideration of [six

enumerated factors]."  28 U.S.C. § 1332(d)(3).  As explained above, the Court finds that far more

than one-third of the Plaintiff class are Louisiana citizens.  Additionally, an examination of the six

factors weighs heavily in favor of remand.

      The claims asserted in this action involve matters of primarily intrastate interest.  Plaintiffs

assert claims related to the loss of electricity as a result of Hurricane Isaac.  All of the claims in this

matter pertain to electricity which was lost at a Louisiana location, and the alleged failure of

Defendants to promptly restore electricity at these locations.  The state of Louisiana has a strong

interest in ensuring that its citizens are adequately protected from hurricanes and their attendant effects.  Accordingly, the claims in this matter do not primarily involve matters of national or international interest.

Moreover, the claims asserted in this action are primarily governed by Louisiana law.  While the parties have not devoted much attention to this particular issue, the Court notes no party has attempted to argue that this Court has federal question jurisdiction over this case, and the petition appears to plead state law causes of action.

It does not appear that this matter was pled in a manner particularly designed to avoid federal jurisdiction.

The action was brought in a forum with a distinct nexus with the class members, the alleged harm, and the defendants.  This case was originally filed in the Civil District Court for Orleans Parish, which has a distinct nexus with the class members in that one of the two proposed classes consists only of customers who lost power in Orleans Parish.  Similarly, a large portion of the alleged harm occurred in Orleans Parish.  Furthermore, Orleans Parish has a distinct nexus with the defendants.  Both Entergy and ENO have their principal place of business in Orleans Parish and ELL's principal place of business is in neighboring Jefferson Parish.

The final two factors, whether the number of proposed class members who are Louisiana citizens is substantially larger than the number of citizens from any other state, and whether any similar class actions have been recently filed, have been adequately addressed in other parts of this

opinion and will not be readdressed here.  Both weigh heavily in favor of remand.

Accordingly, because all of the requirements for discretionary remand are met, this Court finds that, in the interests of justice and looking at the totality of the circumstances, this particular case should be remanded to state court.  "Congress crafted CAFA to exclude only a narrow category of truly localized controversies, and § 1332(d)(3) provides a discretionary vehicle for district courts to ferret out the controversy that uniquely affects a particular locality to the exclusion of all others." *Preston I*, 485 F.3d at 812.  This is precisely the type of case which Congress intended to be handled by state courts.  Therefore, in accordance with both the letter and spirit of CAFA, this case is remanded to the Civil District Court for the Parish of Orleans.

### CONCLUSION

For the foregoing reasons,  Defendants' Motion to Exclude is GRANTED IN PART and DENIED IN PART, Plaintiffs' Motion to Remand is GRANTED and this matter is REMANDED to the Civil District Court for the Parish of Orleans.

New Orleans, Louisiana, this 21st day of October, 2013.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**